UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

KENNETH BRUNSON,

       Plaintiff,

vs.                                                    Case No.  3:09-cv-984-J-MCR

MICHAEL ASTRUE, Commissioner of the
Social Security Administration,

       Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

This cause is before the Court on Plaintiff's appeal of an administrative decision

denying his application for Social Security benefits.  The Court has reviewed the record,

the briefs, and the applicable law.  For the reasons set forth herein, the Commissioner's

decision is **REVERSED** and **REMANDED** for proceedings not inconsistent with this

opinion.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income ("SSI") on July 19,

2006, alleging an inability to work since July 10, 2006.  (Tr. 110-12).  The Social

Security Administration ("SSA") denied Plaintiff's claim initially and upon

reconsideration.  (Tr. 68-70, 76-78).  Plaintiff requested and received a hearing before

an Administrative Law Judge ("ALJ") on July 31, 2007.  (Tr. 79).  The hearing took place

on October 30, 2008 in Jacksonville, Florida.  (Tr. 19).  The ALJ issued an unfavorable

_____

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate
Judge.  (Doc. 15).

decision on November 12, 2008.  (Tr. 16-27).  The Appeals Council denied Plaintiff's

request for review on August 6, 2009.  (Tr. 1-5).  Plaintiff now seeks judicial review of

the ALJ's final decision under 42 U.S.C. § 405(g).

## II.    NATURE OF DISABILITY CLAIM

### A.    Basis of Claimed Disability

Plaintiff claims to be disabled since July 10, 2006 due to cirrhosis of the liver,

ulcer, depression, anxiety, substance abuse disorder (alcoholism), lower back pain,

balance problems, and peripheral neuropathy.  (Tr. 126, 146, 150).

### B.    Summary of Applicable Evidence Before the ALJ

Plaintiff was 49 years of age at the time the ALJ conducted the February 18,

2009 administrative hearing.  (Tr. 26).  Plaintiff has a tenth grade education and past

relevant work as a bagger in a factory and a potato picker on a farm.  (Tr. 137, 140).

Plaintiff claims to be disabled since July 10, 2006 due to cirrhosis of the liver, ulcer,

depression, anxiety, substance abuse disorder (alcoholism), lower back pain, balance

problems, and peripheral neuropathy.  (Tr. 126, 146, 150).  As this appeal deals

primarily with Plaintiff's mental and neurological impairments, the Court will limit its

discussion to the medical evidence regarding those conditions.

In September 2006, Plaintiff visited his primary care physician, Dr. Noshin Najafi,

at Shands Jacksonville, complaining of numbness in his hands and weakness of grip.

(Tr. 276).  Plaintiff denied experiencing numbness in his lower extremities.  (Tr. 276).

Dr. Najafi referred Plaintiff for testing on his vitamin B12 levels to check for peripheral

neuropathy.  (Tr. 277).  One month later, Plaintiff again visited Dr. Najafi complaining of

numbness in his hands, which made him feel like he was wearing gloves.  (Tr. 322).  In

his report, the doctor noted Plaintiff had "numbness in upper extremities probably due to

alcoholic neuropathy."  (Tr. 323).

In December 2006, Plaintiff visited Dr. Najafi complaining of depression,

loneliness, and anxiety.  (Tr. 319).  Plaintiff told Dr. Najafi that he had been depressed

in the past and used alcohol to cope and since he stopped drinking, his symptoms had

returned.  Id.  Dr. Najafi prescribed Paxil for Plaintiff's depression and referred him to

psychiatry.  (Tr. 320).

The following January, Plaintiff met with Dr. Najafi again and complained of back

pain, weakness or numbness in his upper extremities, dizziness, depression, and

anxiety.  (Tr. 380).  Plaintiff also reported imbalance with walking for more than a year.

Id.  Dr. Najafi referred Plaintiff to neurology for his imbalance and numbness and also

for a head CT scan.  (Tr. 381-82).  Under the "Active Problems" and "Assessment"

sections in his report, Dr. Najafi noted Plaintiff suffered from peripheral neuropathy.  (Tr.

380, 382).

In March 2007, Plaintiff met with Dr. Justin Lindquist in the neurological clinic at

Shands Jacksonville for an evaluation of his neuropathy.  (Tr. 375).  Plaintiff told Dr.

Lindquist that he could walk normally at times, but was often easily unbalanced and fell

toward either side.  Id.  Plaintiff also reported that his hands felt weak and he had

difficulty gauging where they were in space or how much strength he was applying to

complete a given task.  Id.  Plaintiff denied weakness or parestesias in his legs, but said

he felt tingling in his hands.  Id.  Plaintiff denied having increased trouble with his

balance when his eyes were closed.  Id.  During the physical exam, Dr. Lindquist noted

Plaintiff had mild clubbing, but no cyanosis or edema.  (Tr. 376).  Both gastrocnemius muscles appeared atrophied.  Id.  Plaintiff had moderately diminished vibratory sense in both feet and hyperalgesia to painful stimuli in his feet.  Id.  Plaintiff had mild dysmetria in both arms and moderate heel-to-shin ataxia, which was greater in the left leg than the right.  Id.  Plaintiff's gait was narrow-based and slightly unsteady, and heel-to-toe walking was accomplished with great difficulty.  Id.  Dr. Lindquist opined, "I think, more than likely, the patient has two concurrent problems: cerebral atrophy, due to alcoholism, and peripheral neuropathy."  Id.  Dr. Lindquist ordered an MRI to evaluate the former and blood work to evaluate the latter.  (Tr. 377).  He also recommended Plaintiff stop taking his B6 vitamins.  Id.

Later in March 2007, Plaintiff followed up with Dr. Najafi and complained his anti-depressant medication, Paxil, was causing paranoia.  (Tr. 372).  Dr. Najafi discontinued the Paxil and prescribed Wellbutrin instead.  (Tr. 374).  Plaintiff followed up with Dr. Najafi in April 2007 and reported his symptoms had improved with the Wellbutrin.  (Tr. 370).

In June 2007, state consulting psychiatrist Dr. Gary Buffone completed a Psychiatric Review Technique ("PRT") form.  (Tr. 398-411).  Dr. Buffone determined Plaintiff's affective disorder and anxiety-related disorder were not severe.  (Tr. 398).  Dr. Buffone opined Plaintiff had mild restrictions in his activities of daily living; no difficulties in maintaining social functioning; mild difficulties in concentration, persistence, or pace; and no episodes of decompensation.  (Tr. 408).  Dr. Buffone cited to Plaintiff's March and April 2007 visits with Dr. Najafi.  (Tr. 410).  Dr. Buffone noted Plaintiff prepared simple meals, occasionally needed reminders about his medications, shopped and

handled money, and maintained his hygiene.  Id.  Dr. Buffone also found Plaintiff had difficulty with instructions, but opined his "limitations, if present, [were] primarily physical in nature."  Id.  Dr. Buffone further noted Plaintiff showed improvement with his medications, had no formal mental health treatment, and had a reasonably intact active daily life.  Id.

State consulting physician, Dr. Audrey Goodpasture, completed a Physical Residual Functional Capacity ("RFC") assessment that same month.  (Tr. 412-19). Dr. Goodpasture did not expressly determine whether Plaintiff's peripheral neuropathy met or equaled Listing 11.14 (although she determined Plaintiff's cirrhosis did not meet the requisite listing level).  She noted in her report Plaintiff had "mild balance issues/peripheral neuropathy," and then stated, "symptoms appear to exceed that expected by review of MER and objective findings."  (Tr. 417)  Dr. Goodpasture advised Plaintiff should "avoid heights due to mild balance loss," and therefore, could never climb ladders, ropes, or scaffolds, but he could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  (Tr. 416-17).  Dr. Goodpasture opined Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday, could sit about 6-hours in an 8-hour workday, and had unlimited abilities to push and/or pull.  (Tr. 413).  To support her determination, Dr. Goodpasture cited to Plaintiff's January 22, 2007 visit with his primary care physician, Dr. Najafi, where he complained of imbalance and numbness, his March 15, 2007 consultation with Dr. Lindquist in the neurological clinic, and his April 23, 2007 follow-up with Dr. Najafi.  (Tr.  414).

In July 2007, Plaintiff returned to Dr. Najafi complaining of depression, anxiety,

and insomnia.  (Tr. 447).  Plaintiff stated the Wellbutrin had not helped him at all and he wanted to try something else.  (Tr. 450).  Dr. Najafi discontinued the Wellbutrin and prescribed Zoloft instead.  (Tr. 449).  Dr. Najafi referred Plaintiff to Dr. Satyen Madkaiker in psychiatry for evaluation.  Id.

Plaintiff met with Dr. Satyen Madkaiker in September 2007.  (Tr. 421).  Plaintiff reported he had bad nerves, did not like to see people, and had no interest in other people in general.  Id.  He said he felt jumpy when the telephone rang and slept with a gun to protect himself.  Id.  He felt socially isolated, was self-preoccupied, and was sometimes hypervigilant.  Id.  Plaintiff told Dr. Madkaiker these symptoms had recently increased substantially.  Id.  Plaintiff reported he felt sad and discouraged about the future.  (Tr. 421).  He felt like a failure.  Id.  Plaintiff said he was unable to sleep, and was tired about almost everything.  Id.  Plaintiff said he could not work at all.  Id.  Dr. Madkaiker noted Plaintiff was positive for multiple symptoms of depression and was currently being treated with Zoloft.  (Tr. 421).  Dr. Madkaiker also reported Plaintiff spoke slowly and his speech was incomprehensible at times.  (Tr. 422).  Plaintiff described his mood as depressed and Dr. Madkaiker recorded Plaintiff's affect was depressed.  Id.  Dr. Madkaiker reported Plaintiff's thoughts were mostly coherent and Plaintiff was able to give relevant answers.  Id.  Plaintiff had partial insight and his judgment was mostly fair.  Id.  Dr. Madkaiker diagnosed Plaintiff with "major depressive disorder of moderate to severe intensity without psychosis."  Id.  Plaintiff had mild to moderate stressors, and a GAF of 20 to 25 at admission.  Id.  For treatment, Dr. Madkaiker recommended an increase in Plaintiff's dosage of Zoloft and for Plaintiff to be seen by a psychotherapist at the outpatient clinic.  Id.

In October 2007, Plaintiff met with Dr. Lindquist in the neurology clinic at Shands for a follow-up regarding his progressive gait abnormalities. (Tr. 433). Plaintiff reported no improvement in his gait and diminished sensation in his feet Id. Plaintiff had completed his MRI as recommended at his last appointment with Dr. Lindquist in March 2007, but had not completed the blood work as requested. Id. The MRI of Plaintiff's brain showed "significant cerebellar vermis atrophy with diffuse white matter changes." (Tr. 434). During the physical examination, Plaintiff's gait was "narrow-based and steady, however, heel-toe walking [was] significantly impaired." Id. There was moderately diminished vibratory sense in both feet and minimally diminished vibratory sense at the knees. Id. Plaintiff had "marked symmetrical dysdiadochocinesia" and "heel-to-shin ataxia markedly impaired bilaterally" with no tremor. (Tr. 434). Dr. Lindquist assessed Plaintiff with "significant vermal atrophy likely due to alcoholism" and "mild to moderate large fiber peripheral neuropathy of unclear etiology." Id. Dr. Lindquist recommended Plaintiff acquire a cane and continue with his Thiamine (vitamin B1), although it "[was] probably too late to have an effect." Id. Dr. Lindquist also reordered the blood work he had requested in March. Id. At his follow-up appointment with Plaintiff later that month, Dr. Najafi added "ataxia" to the section titled "Assessment" in his report. (Tr. 439).

In October 2007, Plaintiff also met with Dr. Madkaiker in the psychiatry department at Shands. (Tr. 480). Plaintiff reported his symptoms had improved and he was feeling much less anxious. Id. Plaintiff stated he continued to have issues with insomnia and woke up feeling severe anxiety after about seven hours of sleep. Id. Dr. Madkaiker noted Plaintiff had "reasonably good insight into his mental status and his

judgment [was] mostly fair." Id. Dr. Madkaiker diagnosed Plaintiff with "depressive disorder, not otherwise specified, with generalized anxiety disorder." Id. He recommended Plaintiff continue taking Zoloft and start temazepam at bedtime for insomnia. Id.

Plaintiff met with Dr. Lindquist in the neurology clinic again in December 2007, and reported his problem had not deteriorated or otherwise changed. (Tr. 431). Plaintiff still had not obtained the blood work requested by Dr. Lindquist nor obtained the recommended cane. Id. During the physical examination, Plaintiff's gait was "narrow based and steady without any significant difficulty turning." Id. Plaintiff had "slightly diminished tone in both legs," and "moderately diminished vibratory sense in both lower extremities." (Tr. 432). Dr. Lindquist noted "mild heel-to-shin ataxia on the right, but significant on the left." Id. Dr. Lindquist assessed Plaintiff with "cerebella vermal atrophy likely due to alcoholism, stable" and "peripheral neuropathy of unclear etiology." Id. Dr. Lindquist rewrote Plaintiff a prescription for a cane and asked Plaintiff to get his blood drawn that day for testing. Id.

Plaintiff also met with Dr. Madkaiker again in December 2007. (Tr. 481). Plaintiff reported the Zoloft had helped him and there were times he felt happy. Id. Plaintiff stated he continued to have problems with insomnia and only got three to four hours of sleep each night, although Plaintiff acknowledged his smoking habit might be contributing to his insomnia. Id. Again, Dr. Madkaiker noted Plaintiff had "reasonably good insight into his mental status and his judgment [was] mostly fair." Id. Dr. Madkaiker diagnosed Plaintiff with "depressive disorder, not otherwise specified," and with "generalized anxiety disorder." Id. He recommended Plaintiff continue taking

Zoloft and visiting the outpatient clinic, and increased Plaintiff's dosage of temazepam.
Id.

Following that visit, Dr. Eduardo Sanchez, another psychiatrist at Shands, took

over treatment for Plaintiff's mental health issues.  (Tr. 482).  In March 2008, Plaintiff

met with Dr. Sanchez and reported the counseling sessions at the outpatient clinic had

been helpful.  Id.  Dr. Sanchez noted Plaintiff was alert and well-oriented, with no

evidence of a thinking disorder, hallucinations, or delusions.  Id.  Dr. Sanchez reported

"there were cognitive deficits or memory defects present," but "there was no evidence of

depression at the present time."  Id.  He rated Plaintiff's GAF as 65 out of a possible 65.

Id.  Dr. Sanchez diagnosed Plaintiff with a mood disorder.  Id.  Because Plaintiff had

suffered from alcoholism, Dr. Sanchez believed Plaintiff should take a sedating anti-

depressant like mirtazapine rather than the Zoloft and temazepam.  Id.

When Plaintiff returned to Dr. Sanchez in May 2008, he complained the

mirtazapine was not helping him sleep, but Dr. Sanchez believed Plaintiff's six hours of

interrupted sleep each night was "nearly adequate."  (Tr. 484).  Dr. Sanchez

discontinued the mirtazapine and prescribed trazodone instead.  Id.  The mental status

exam showed Plaintiff was alert and well-oriented to person, place, and time.  Id.  Dr.

Sanchez wrote in his report: "There were no hallucinations or delusions.  There were no

cognitive deficits.  There was no thinking disorder.  The patient appeared to be

euthymic, however he talks about all the financial problems and the problems due to his

liver disease with some degree of depressive theme."  Id.  Dr. Sanchez recommended

Plaintiff continue counseling.  Id.

Plaintiff last saw Dr. Sanchez in August 2008.  (Tr. 485).  Dr. Sanchez reported,

"[t]he patient, as usual, comes stating that he has a problem with his nerves, but it is a nonspecific complaint."  Id.  Plaintiff's sleep had been corrected with the trazodone, and Dr. Sanchez did not think Plaintiff required further pharmacological intervention.  Id. The mental status exam showed Plaintiff was "alert, oriented with clear sensorium," and there was "no evidence of thinking disorder, hallucinations, or delusions."  Id.  Plaintiff appeared to be "euthymic" with no cognitive deficit or memory defect.  Id.  Dr. Sanchez prescribed Plaintiff a lower dosage of trazodone for three months.  Id.

At the administrative hearing before the ALJ, Plaintiff testified he did not do any crossword puzzles or word searches, but he watched TV.  (Tr. 37-38).  He did not drive, but he visited family during the holidays.  (Tr. 38-39).  Plaintiff testified his depression medication helped him sleep better.  (Tr. 40).  He stated he had good days and bad days and during the bad days, he did not answer the phone or the door and would stay in bed.  (Tr. 41-42).  Plaintiff had a cane which he used all of the time, except for sometimes when he was in his home.  (Tr. 39).  If he was not using the cane around the home, then he needed to hold on to the walls or furniture to get around.  Id.  If he did not use the cane, he became off-balanced.  (Tr. 40).

### C.   Summary of the ALJ's Decision

A plaintiff is entitled to disability benefits when he is unable to engage in substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve (12) months.  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).  The ALJ must follow five steps in evaluating a claim of disability.  20 C.F.R. § 416.920(a).  First, if a claimant is working at a

substantial gainful activity, he is not disabled.  20 C.F.R. § 416.920(a)(4)(i).  Second, if a

claimant does not have any impairment or a combination of impairments which

significantly limit his physical or mental ability to do basic work activities, then he does

not have a severe impairment and is not disabled.  20 C.F.R. § 416.920(a)(4)(ii).  Third,

if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1, he is disabled.  20 C.F.R. § 416.920(a)(4)(iii).  Fourth, if a

claimant's impairments do not prevent him from doing past relevant work, he is not

disabled.  20 C.F.R. § 416.920(a)(4)(iv).  Fifth, if a claimant's impairments (considering

his RFC, age, education, and past work) prevent him from doing other work that exists

in the national economy, then he is disabled.  20 C.F.R. § 416.920(a)(4)(v).  Plaintiff

bears the burden of persuasion through step four, while at step five, the burden shifts to

the Commissioner.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287 (1987).

In this case, at step one, the ALJ found Plaintiff had not engaged in substantial

gainful activity since his alleged onset date of July 19, 2006.  (Tr. 21).  At step two, the

ALJ found Plaintiff had the following severe impairments: cirrhosis of the liver, ulcer,

peripheral neuropathy, depression, generalized anxiety disorder, and substance abuse

disorder (alcoholism) in remission.  Id.  At step three, the ALJ determined Plaintiff did

not have an impairment that met or equaled any of the impairments listed in Appendix 1,

Subpart P of Regulation No. 4.  Id.

The ALJ further determined Plaintiff retained the residual functional capacity

("RFC") to perform light work as defined in 20 CRF 416.967(b), with the following

limitations:

> [H]e must avoid work where he would have to operate heavy

> machinery, be exposed to unusual stress, or have to work on ladders or at unprotected heights.  The claimant can only occasionally bend, crouch, kneel, stoop, squat, or crawl, and requires the use of a mono case to ambulate.  Non-exertionally, the claimant is limited to the performance of unskilled work.

(Tr. 23).  In making this determination, the ALJ found Plaintiff's impairments could reasonably be expected to produce the alleged symptoms.  (Tr. 25).  However, Plaintiff's assertions concerning the intensity, persistence, and limiting effects of the alleged symptoms were not entirely credible to the extent they were inconsistent with the RFC assessment.  Id.

At step four, the ALJ utilized the testimony of a vocational expert ("VE") during the hearing to determine if Plaintiff could perform any of his past relevant work.  (Tr. 26). The VE explained Plaintiff could perform his past work of a ripper as the job is customarily performed in the national economy.  Id.  Accordingly, the ALJ found Plaintiff was not disabled within the meaning of the Social Security Act.  Id.

## III.   ANALYSIS

### A.    The Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a

reasonable person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (explaining how the court must scrutinize the entire record to determine reasonableness of factual findings).

The district court will reverse a Commissioner's decision on plenary review, however, if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine the Commissioner properly applied the law.  Keeton v. Dep't of Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

### B.   Issues on Appeal

Plaintiff argues several issues on appeal.  First, Plaintiff contends the ALJ failed to make specific findings as to the impact of Plaintiff's moderate limitations in concentration, persistence, and pace on his ability to perform work; failed to include specific corresponding limitations into the RFC assessment; and failed to include these limitations in the hypothetical questions posed to the VE.  (Doc. 20, p. 1).  Second,

Plaintiff contends the ALJ failed to address the decline in Plaintiff's condition after the state agency reconsideration denial was issued and failed to consider the effects of the new diagnosis of ataxia on Plaintiff's ability to work.  (Doc. 20, p. 2).  Third, Plaintiff contends the ALJ failed to obtain an updated opinion of a medical expert as to whether Plaintiff's condition met or equaled the requirements of Listing 11.14 (governing peripheral neuropathy) even though Plaintiff's condition worsened after the date of the state agency medical expert review.  (Doc. 20, p. 1).

1. **Whether the ALJ failed to properly consider Plaintiff's mental limitations and include them in the hypothetical posed to the VE.**

Plaintiff contends the ALJ failed to make specific findings as to the impact of Plaintiff's moderate concentration, persistence, and pace limitations on his ability to perform work; failed to include specific corresponding limitations into the RFC assessment; and failed to include these limitations in the hypothetical questions posed to the VE.  (Tr. Doc. 20, p. 1)

In considering an individual with a mental impairment, the ALJ is required to use the "'special technique' dictated by the [Psychiatric Review Technique Form] for evaluating mental impairments."  Moore v. Barnhart, 405 F.3d 1208, 1213 (11th Cir. 2005) (citing 20 C.F.R. § 404.1520a-(a)).  This technique requires separate evaluations on a four-point scale of how the individual's mental impairment impacts four functional areas: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  Id. (quoting 20 C.F.R. § 404.1520a-(c)(3-4)).  The ALJ is required to complete a PRTF and append it to the decision or incorporate the results of this technique into the findings and conclusions of his decision.  Id. at 1214.

Failure to do so requires remand.  Id.

Plaintiff argues the ALJ failed to apply the limitations noted in the PRTF to

Plaintiff's ultimate RFC and the hypothetical posed to the VE.  (Doc. 20, p. 11).  The

Commissioner responds that Social Security Regulation 96-8p dictates that the

limitations identified in the PRTF are not an RFC assessment but are used at steps 2

and 3 to determine the severity of the mental impairment and whether it meets the

criteria of a listed impairment.  (Doc. 23, p. 6).

SSR 96-8p provides:

> The psychiatric review technique described in 20 CFR
> 404.1520a and 416.920a and summarized on the Psychiatric
> Review Technique Form (PRTF) requires adjudicators to
> assess an individual's limitations and restrictions from a
> mental impairment(s) in categories identified in the "paragraph
> B" and "paragraph C" criteria of the adult mental disorders
> listings.  The adjudicator must remember that the limitations
> identified in the "paragraph B" and "paragraph C" criteria are
> not an RFC assessment but are used to rate the severity of
> mental impairment(s) at steps 2 and 3 of the sequential
> evaluation process.  The mental RFC assessment used at
> steps 4 and 5 of the sequential evaluation process requires a
> more detailed assessment by itemizing various functions
> contained in the broad categories found in paragraphs B and
> C of the adult mental disorders listings in 12.00 of the Listing
> of Impairments, and summarized on the PRTF.

SSR 96-8p.  Further, SSR 96-8p requires the RFC to address nonexertional capacities,

including mental limitations and restrictions, which must be expressed in terms of work-

related functions.  SSR 96-8p.  "Work-related mental activities generally required by

competitive, remunerative work include the abilities to: understand, carry out, and

remember instructions; use judgment in making work-related decisions; respond

appropriately to supervision, co-workers, and work situations; and deal with changes in a

routine work setting." SSR 96-8p.

Accordingly, the Commissioner is correct that the limitations noted in the PRTF are not an RFC, however, it does not necessarily follow that they should not be included in the RFC or considered at steps four and five of the sequential analysis. Instead, the ALJ is required to conduct "a more detailed analysis" of the four categories listed in the PRTF when formulating the RFC and express Plaintiff's nonexertional capacity in terms of work-related function. Indeed, the Eleventh Circuit recently rejected the Commissioner's argument and held that even though "the PRT and RFC evaluations are undeniably distinct, nothing precludes the ALJ from considering the results of the former in his determination of the latter." Winschel v. Commissioner of Social Sec., __ F.3d. __, 2011 WL 198372, *3 (11th Cir. Jan. 24, 2011) (internal citations omitted).

In Millhouse v. Astrue, the ALJ found the plaintiff had moderate limitations in concentration, persistence, or pace and in social functioning, but determined these limitations only limited the plaintiff to unskilled work in the RFC. Millhouse v. Astrue, No. 8:08-CV-378-T-TGW, 2009 WL 763740, at *2 (M.D. Fla. Mar. 23, 2009). The court reversed and remanded, reasoning:

> Simply finding that the plaintiff had a mental limitation of unskilled work clearly does [not] [sic] constitute 'a more detailed assessment by itemizing various functions contained in the broad categories' of social functioning and concentration, persistence, or pace. Furthermore, moderate limitations in social functioning and concentration, persistence, or pace constitute greater restrictions than a limitation to unskilled work. 'Unskilled work' is defined as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.' 20 C.F.R. 416.968(a). It is not apparent to me that a person with moderate limitation in concentration, persistence, or pace could adequately perform all types of unskilled sedentary

work.

Id. at *3-4.

In the instant case, the ALJ concluded Plaintiff had moderate limitations in concentration, persistence, or pace.  (Tr. 22).  However, the only reference to Plaintiff's mental impairment contained in the RFC was: "[n]on-exertionally, the claimant is limited to the performance of unskilled work."  (Tr. 23).  Following the reasoning in Millhouse, the RFC does not appear to adequately reflect Plaintiff's mental impairment and certainly does not reflect "a more detailed analysis" with specific findings as to the impact of Plaintiff's moderate concentration, persistence, and pace limitations on his ability to perform work.

The Commissioner asserts the ALJ provided a "function-by-function" assessment and a "narrative discussion" explaining his findings regarding Plaintiff's mental abilities when he summarized the evidence from Plaintiff's treating psychiatrists.  (Doc. 23, p. 7). The ALJ provided the following explanation:

> As for the claimant's mental state, though he would still be expected to suffer from some limitations, which would limit him to unskilled jobs without unusual stress, a review of Dr. Madkaiker's and Dr. Sanchez's notes suggest that the claimant's mental condition has steadily maintained at a GAF of 65, which would indicate that though the claimant was having some functional difficulties, he was functioning well in general.  Despite the claimant's testimony, these same records indicate that the claimant's sleeping difficulties were controlled with medication, and though he testified to having fluctuations in his mental state, the psychiatric records indicate that his mental state was quite stable with medication.  Therefore no additional limitations can be found to be caused by the claimant's impairments.

(Tr. 25).  The Court is not convinced this narrative provides a "function-by-function"

assessment or expresses Plaintiff's nonexertional capacity in terms of work-related functions. The ALJ's decision does not address the impact of Plaintiff's moderate limitations in concentration, persistence, or pace on his ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p.

However, as this Court noted in Corbitt v. Astrue, when the ALJ relies on the testimony of a VE, "the key inquiry shifts to the adequacy of the RFC description contained in the hypothetical posed to the VE" rather than the RFC simply cited in the ALJ's decision. Corbitt v. Astrue, No. 3:07-CV-518-J-HTS, 2008 WL 1776574, at *3 (M.D. Fla. Apr. 17, 2008) (citing Dowell v. Barnhart, No. 06-1023-WEB, 2006 WL 4046164, at *3 (D. Kan. Oct. 31, 2006)). In the Corbitt case, the ALJ did not include in his RFC the plaintiff's moderate limitations in maintaining concentration, persistence and pace as noted in the PRTF. Corbitt, 2008 WL 1776574 at *2. However, the ALJ specifically included the moderate difficulty in maintaining concentration, persistence and pace in the hypothetical to the VE. Id. at *3. As such, the Court found no error. Id.

When the ALJ does not specifically include his PRT findings in the hypothetical posed to the VE, the Court must analyze the hypothetical to determine if it properly accounts for plaintiff's mental limitations. Several circuits (including the Eleventh in an unpublished opinion) have rejected the argument that an ALJ accounts for a plaintiff's deficiencies in concentration, persistence, or pace by merely restricting the VE's inquiry to simple, routine, or repetitive tasks, or unskilled work. See Winschel, 2010 WL 198372, at *3 (listing cases); Richter v. Commissioner of Social Sec., 379 F.App'x 959,

960-62 (11th Cir. 2010) (limiting hypothetical to unskilled jobs and referencing plaintiff's

moderate limitation in the ability to remember, understand, and carry out detailed

instructions does not account for deficiencies in concentration, persistence, or pace);

Stewart v. Astrue, 561 F.3d 679, 684-85 (7th Cir. 2009) (limiting hypothetical to simple,

routine tasks does not account for plaintiff's moderate difficulties in maintaining

concentration, persistence, and pace); Ramirez v. Barnhart, 372 F.3d 546, 554 (3rd Cir.

2004) (limiting hypothetical question to simple, one-to-two step tasks does not account

for deficiencies in concentration, persistence, or pace); Newton v. Chater, 92 F.3d 688,

695 (8th Cir. 1996) (limiting hypothetical to simple jobs does not account for moderate

deficiencies in concentration, persistence, or pace).

 However, if medical evidence affirmatively demonstrates that a plaintiff retains the

ability to engage in simple, routine, or repetitive tasks, or unskilled work despite

deficiencies in concentration, persistence, or pace, then including such restrictions in the

hypothetical sufficiently accounts for the deficiencies.  See Winschel, 2010 WL 19372, at

*3; Simila v. Astrue, 573 F.3d 503, 521 (7th Cir. 2009) (hypothetical adequately

accounted for deficiencies in concentration, persistence, or pace where it restricted VE's

inquiry to unskilled sedentary-level work, and plaintiff's concentration limitations

stemmed completely from chronic back pain that was not aggravated by sedentary

work); Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174-76 (9th Cir. 2008) (hypothetical

adequately accounted for deficiencies of concentration, persistence, or pace where it

restricted VE's inquiry to simple, routine, repetitive tasks, and plaintiff's physician testified

she could still "carry out simple tasks" despite her slow pace); Howard v. Massanari, 255

F.3d 577, 582 (8th Cir. 2001) (hypothetical adequately accounted for deficiencies of

concentration, persistence, or pace where it restricted VE's inquiry to simple, routine, repetitive tasks, and psychologist determined plaintiff could perform such tasks without severe restrictions).  Further, a hypothetical may implicitly account for a plaintiff's deficiencies in concentration, persistence, and pace.  See White v. Commissioner of Social Sec., 572 F.3d 272, 288 (6th Cir. 2009) (deficiencies of concentration, persistence, or pace were adequately accounted for in hypothetical where ALJ referenced plaintiff's inability to maintain attention and concentration); Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002) (deficiencies of concentration, persistence, or pace were adequately accounted for where ALJ directed VE to credit testimony of doctor testifying to such deficiencies).

Accordingly, this Court will analyze the hypothetical posed by the ALJ in this case. In the hypothetical posed to the VE, the ALJ stated in pertinent part: "[The hypothetical person] needs to avoid unusual stress, he needs simple tasks."  (Tr. 46).  Therefore, the ALJ did not explicitly include any limitation regarding Plaintiff's deficiencies in maintaining concentration, persistence, or pace, despite the ALJ's finding that Plaintiff had moderate limitations in this area.  Nor does the hypothetical implicitly account for Plaintiff's mental limitations because there was no further description or reference to Plaintiff's mental abilities or limitations during the hearing, and as explained earlier, a restriction to "simple tasks" does not sufficiently encompass the moderate limitations of concentration, persistence, or pace.  See Richter, 2010 WL 2017650, at *2-4; Stewart, 561 F.3d at 684-85; Ramirez, 372 F.3d at 554; Newton, 92 F.3d at 695.  Additionally, there is no medical evidence that, despite these limitations, Plaintiff nevertheless retained the ability to perform simple, repetitive, and routine tasks or unskilled work.

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002) (citing Jones v. Apfel, 190 F.3d 1224, 1230 (11th Cir. 1999)).  Because the hypothetical posed to the VE in this case did not comprise all of Plaintiff's impairments; specifically, his moderate limitations in concentration, persistence, or pace; the ALJ's decision is not supported by substantial evidence and remand is necessary.

**2.      Whether the ALJ failed to adequately consider Plaintiff's neurological impairments.**

Plaintiff next contends the ALJ failed to adequately consider the decline in Plaintiff's condition after the state agency reconsideration denial was issued and failed to consider the effects of the new diagnosis of ataxia on Plaintiff's ability to work.  (Doc. 20, p. 2).  The Court agrees the ALJ failed to adequately consider Plaintiff's neurological conditions for a variety of reasons.

Plaintiff is correct the ALJ is required to consider all of the evidence in the claimant's record when making a disability determination.  See 20 C.F.R. §§404.1520(a). In addition, the ALJ "should state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence." Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990).  Indeed, "[u]nless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir.

1981) (quoting Stawls v. Califano, 596 F.2d 1209, 1213 (4th Cir. 1979)).  Further, remand

is necessary "when an ALJ fails to consider properly a claimant's condition despite

evidence in the record of the diagnosis."  Vega v. Commissioner of Social Sec., 265 F.3d

1214, 1219 (11th Cir. 2001) (citing Marbury v. Sullivan, 957 F.2d 837, 839-40 (11th Cir.

1992)).  Although the ALJ is required to consider all of the evidence, he is not required to

discuss all of the evidence presented, but rather must explain why "significant probative

evidence has been rejected."  Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

     Plaintiff specifically argues the ALJ failed to adequately explain whether and how

ataxia affected Plaintiff's ability to work.  The Court agrees because the ALJ did not

discuss or reference Plaintiff's ataxia anywhere in his opinion.  (Tr. 19-27).  Therefore, it

must be assumed evidence of this condition was either ignored, overlooked, or rejected

without explanation.  While it is  true, as the Commissioner cites, "there is no rigid

requirement that the ALJ specifically refer to every piece of evidence in his decision,"

Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005), the undersigned believes there is

a difference in failing to discuss a pain medication the plaintiff had been prescribed on

one occasion (as was the case in Dyer) and failing to discuss probative evidence of one

of Plaintiff's diagnoses (as is the case here).  The undersigned finds Dr. Lindquist's

diagnosis of ataxia and the corresponding medical reports to be significantly probative

evidence of whether Plaintiff meets Listing 11.14, which governs the medical condition of

peripheral neuropathies.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.14.  A plaintiff meets

the requirements of Listing 11.14 if the plaintiff experiences peripheral neuropathy with

"disorganization of motor function as described in 11.04B, in spite of prescribed

treatment."  Id.  Section 11.04B requires "significant and persistent disorganization of

motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.104B.  Finally, section 11.00C defines "persistent disorganization of motor function" as follows:

> [P]aresis or paralysis; tremor or other involuntary movements; <u>ataxia; and sensory disturbances</u> (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, <u>frequently provides the sole or partial basis for decision in cases of neurological impairment</u>. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00C (emphasis added).  Accordingly, because the existence of ataxia is potentially determinative as to Listing 11.14, the ALJ was required to at least explain his reasoning for discounting Plaintiff's diagnosis of ataxia. Otherwise, the Court cannot find the ALJ's decision to be supported by substantial evidence.

Further, when discussing Plaintiff's neurological conditions, the ALJ failed to reference or address the records kept by Plaintiff's treating neurologist, Dr. Lindquist. Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  See <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997); <u>Edwards</u>, 937 F.2d at 583; 20 C.F.R. § 404.1527(d).  Here, the ALJ stated he gave controlling weight to the opinions of Dr. Najafi, Dr. Madkaiker, and Dr. Sanchez because "they provided treatment to the claimant and regularly monitored his condition, which gives their notes particular value in assessing the claimant's long term effects caused by the claimant's conditions."  (Tr. 25).

However, Dr. Lindquist is a neurological specialist who regularly monitored and treated Plaintiff's neurological conditions and provided detailed notes of his physical examinations.  (Tr. 375-76, 431-32, 433-34).  Dr. Lindquist's reports included details of Plaintiff's neurological examinations that were not available in the reports from Dr. Najafi cited by the ALJ in his decision and should have been particularly valuable in determining the effects of Plaintiff's neurological conditions on his ability to work.  As such, the ALJ was required to grant substantial weight to Dr. Lindquist's notes or to clearly articulate reasons for granting them less weight.

Plaintiff is also correct the ALJ must consider the combined effect of all of the claimant's impairments when determining whether a claimant's physical and mental impairments are sufficiently severe and must consider any medically severe combination of impairments throughout the entire disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled.  Id.; see also Walker v. Bowen, 826 F.2d 996, 1001 (11th Cir. 1987) (ALJ did not properly consider claimant's impairments in combination where he failed to  mention or reference all of claimant's alleged impairments except to state, "subjectiv[e] complain[t]s do not establish disabling pain"); Williams v. Barnhart, 186 F.Supp.2d 1192, 1200-01 (M.D. Ala. 2002) (ALJ's conclusory statement, without analysis, articulating his finding with respect to the impact of the combination of impairments was error and required remand for the ALJ to "articulate express consideration of and to make express findings regarding the severity of all of the claimant's impairments that are evident from the record" and to "make findings regarding the effect of the combination of [claimant's]

conditions").

In the instant case, the record indicates Plaintiff experienced a variety of neurological conditions, including significant vermal atrophy, mild to moderate peripheral neuropathy, mild to marked heel-to-shin ataxia, marked symmetrical dysdiadochocinesia, moderately diminished vibratory sense in both feet, and mild dysmetria in both arms. (Tr. 376, 432, 434).  The ALJ did not specifically mention all of these neurological conditions, nor did he reference any of the medical reports in which observations and details of these conditions appeared.  In determining whether Plaintiff met a listing, the ALJ found without further analysis:

> The claimant does not have an impairment or combination or impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1...The claimant's peripheral neuropathy has not been demonstrated to meet or medically equal subsection 11.14 of section 11.00 because this condition has not been demonstrated to cause persistent disorganization of motor function as described at 11.00(C) and 11.04(B).

(Tr. 21).  As stated before, "persistent disorganization of motor function in the form of...ataxia; and sensory disturbances...which occur singly or in various combinations...frequently provides the sole or partial basis for decision in cases of neurological impairment."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00C. Accordingly, the ALJ should have explained why Plaintiff's neurological conditions in combination, including the documented ataxia and other sensory disturbances, did not meet the requirements of Listing 11.14.  The ALJ's mere conclusion, without more, that Plaintiff's impairments or combination of impairments do not meet or equal a listing is insufficient to constitute substantial evidence.  See Williams, 186 F.Supp.2d at 1199.

Accordingly, the undersigned believes it was error for the ALJ to ignore, overlook, or reject Dr. Lindquist's reports and the diagnosis of ataxia without an explanation. Further it was error for the ALJ to fail to consider all of Plaintiff's neurological impairments in combination when determining if Plaintiff met Listing 11.14.  Therefore, the case must be remanded.

**3.    Whether the ALJ improperly failed to obtain an updated opinion from a medical expert as to whether Plaintiff's condition met or equaled a Listing.**

Plaintiff contends the ALJ failed to obtain an updated opinion of a medical expert as to whether Plaintiff's condition met or equaled the requirements of Listing 11.14 (governing peripheral neuropathy) even though Plaintiff's condition worsened after the date of the initial state agency medical expert review.  (Doc. 20, p. 1).

The ALJ is responsible for deciding whether a listing is met or equaled.  Robbins v. Astrue, No. 3:08-CV-692-J-TEM, 2009 WL 3232046, at *5 (M.D. Fla. Sept. 30, 2009) (citing SSR 96-6p).  As trier of the facts, the ALJ is not bound by a finding of a state agency medical consultant as to whether a plaintiff's impairment meets or equals a listing.  Id.  However, the ALJ must receive into evidence and give appropriate weight to an expert opinion from a physician designated by the Commissioner as to whether a plaintiff's impairment(s) meets or equals a listing.  Id.; Wilkinson on Behalf of Wilkinson v. Bowen, 847 F.2d 660, 663 (11th Cir. 1987).  Further, SSR 96-6p dictates an ALJ must obtain an updated medical opinion from a medical expert "when additional medical evidence is received that in the opinion of the [ALJ]...may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  SSR 96-6p.  Thus, the need

for an updated medical opinion is subject to whether the additional evidence, in the

opinion of the ALJ, would have changed the consulting doctor's findings.  See Glen v.

Astrue, No. 2:08-CV-700-WC, 2009 WL 3063335, at *2-3 (M.D. Ala. Sept. 22, 2009).

In the instant case, the state's consulting physician, Dr. Goodpasture, reviewed

Plaintiff's medical records on June 6, 2007 and completed an RFC Assessment.  (Tr.

412-19).  Dr. Goodpasture did not expressly determine whether Plaintiff's peripheral

neuropathy met or equaled Listing 11.14 (although she did determine Plaintiff's cirrhosis

failed to meet the applicable listing).  She noted in her report that Plaintiff had "mild

balance issues/peripheral neuropathy, and then stated, "symptoms appear to exceed

that expected by review of MER and objective findings."  (Tr. 417)  To support that

determination, Dr. Goodpasture cited to Plaintiff's January 22, 2007 visit with his primary

care physician, Dr. Najafi, where he complained of imbalance and numbness, his March

15, 2007 consultation with Dr. Lindquist in the neurological clinic, and his April 23, 2007

follow-up with Dr. Najafi.  (Tr.  414).  At the time of Dr. Goodpasture's review of the

medical record, the results from Plaintiff's MRI and blood work, which had been ordered

during his consultation with Dr. Lindquist on March 15, 2007, were not yet in the medical

record.  Subsequent to Dr. Goodpasture's review of the medical record, Plaintiff was

diagnosed with ataxia and vermal atrophy after an MRI of the brain showed "significant

cerebellar vermis atrophy with diffuse white matter changes."  (Tr. 434).  Plaintiff was

also prescribed a walking cane.  Id.  Prior to the MRI, Dr. Najafi had assessed Plaintiff as

suffering from peripheral neuropathy.  (Tr. 358, 359, 370, 371, 374, 382, 450, 454).

Following Dr. Lindquist's findings, Dr. Najafi amended his assessment of Plaintiff's

conditions to include ataxia and vermal atrophy, as well as peripheral neuropathy.  (Tr.

438, 441, 458).

Plaintiff argues his condition worsened after June 2007 and, as such, the ALJ should have obtained an updated medical opinion.  (Doc. 20, p. 19).  The Commissioner argues the updated medical records would not have changed Dr. Goodpasture's assessment because the diagnosis of ataxia was before her when she rendered her opinion.  (Doc. 23, p.15).  The Commissioner refers to Dr. Lindquist's March 2007 examination, which was cited by Dr. Goodpasture in the RFC assessment, where Dr. Lindquist noted "moderate heel-to-shin ataxia, left greater than right."  (Tr. 432; Doc. 23, p. 15).

It is unclear if Plaintiff's condition actually declined following Dr. Goodpasture's review of the medical record.  In March 2007, Plaintiff's heel-to-shin ataxia was "moderate...left greater than right."  (Tr. 432).  Then, in October 2007, Plaintiff's heel-to-shin ataxia was "markedly impaired bilaterally," which appears to indicate a worsening of the condition.  (Tr. 434).  However, in December 2007, Plaintiff had "mild heel-to-shin ataxia on the right, but significant on the left."  (Tr. 432).  Plaintiff was prescribed a cane in October 2007, which supports the contention his condition was worsening as he had not been prescribed a walking aid prior to that point.  (Tr. 434).  However, Plaintiff's MRI findings seemed to confirm what Dr. Lindquist had already suspected in March 2007.[2]

---

[2] Dr. Lindquist stated in his March 2007 report:
> I think, more than likely, the patient has two concurrent problems: cerebral atrophy, due to alcholosim, and peripheral neuropathy. At this time, to work up the former, we will get an MRI of the brain, to evaluate his cerebellum and brainstem.  We will also get some blood work, to evaluate the latter...

(Tr. 376-77).

Yet, the results from the tests might have shown more significant damage than what was anticipated by Dr. Lindquist and, therefore, by Dr. Goodpasture when she reviewed Dr. Lindquist's records.

Further, it is unclear whether the ALJ thought this evidence, including the increased references to ataxia, might change Dr. Goodpasture's determination because Dr. Goodpasture did not actually make an express determination as to whether Plaintiff met or equaled Listing 11.14 (although her notes indicate that she believed Plaintiff's symptoms exceeded "objective findings," and therefore, she likely did not think Plaintiff met the Listing requirements).

The inclusion of Plaintiff's MRI findings and further consultations with Dr. Lindquist in an updated review of the medical record would provide the consulting medical expert a more complete and detailed record of Plaintiff's neurological conditions to determine whether Plaintiff meets or equals Listing 11.14.  Therefore, in an abundance of caution and as the case is already remanded on the first two issues raised by Plaintiff, the undersigned finds the ALJ should reconsider whether Plaintiff meets Listing 11.14 and determine whether an updated medical opinion from a consulting medical expert will assist in this consideration.

## IV.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is hereby **REVERSED** and **REMANDED** pursuant to sentence four, 42 U.S.C. 405(g).  On remand, the ALJ shall 1) specify any functional limitations arising from Plaintiff's moderate limitations in concentration, persistence, and pace and consider any such limitations in determining

Plaintiff's RFC; 2) specify any functional limitations arising from Plaintiff's ataxia and consider any such limitations in determining Plaintiff's RFC; 3) consider and articulate the weight given to Dr. Lindquist's notes; and 4) consider the combined effect of Plaintiff's neurological impairments to determine whether Plaintiff meets Listing 11.14, obtain an updated medical opinion if one would assist in this determination, and incorporate the functional limitations arising from Plaintiff's combination of neurological impairments into the RFC assessment.  The Clerk of the Court is directed to enter judgment consistent with this opinion and thereafter, to close the file.

Should this remand result in the award of benefits, Plaintiff's attorney is hereby granted, pursuant to Rule 54(d)(2)(B), an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b), until thirty (30) days after the date of the notice of award of benefits from the Social Security Administration. **This order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.**

**DONE AND ORDERED** at Jacksonville, Florida, this __7th__ day of March, 2011.

_Monte C. Richardson_
MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:
Counsel of Record